UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**KEVIN A. TABB,**

        **Plaintiff,**          **CIVIL ACTION NO. 09-10027**

   **vs.**

                                  **DISTRICT JUDGE GEORGE CARAM STEEH**

**COMMISSIONER OF**        **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

        **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION:**    This Court recommends that Plaintiff's Motion for Summary Judgment and/or Remand (docket no. 12) be GRANTED in part, and the instant Complaint REMANDED as set forth herein.

\*\*\*

**II.**    **PROCEDURAL HISTORY:**

Plaintiff filed an application for a period of disability and Disability Insurance Benefits with a protective filing date of June 28, 2005, alleging that he had been disabled since December 1, 2004 due to an impairment of his ankles, toes and heels. (TR 49, 52, 55). The Social Security Administration denied benefits. (TR 34-37). A requested *de novo* hearing was held on May 22, 2008 before Administrative Law Judge (ALJ) George Gaffaney who subsequently found that the claimant was not entitled to a period of disability or Disability Insurance Benefits because he was not under a disability at any time from December 1, 2004 through the date of the ALJ's July 24, 2008 decision. (TR 14, 21, 209). The Appeals Council declined to review the ALJ's decision and

Plaintiff commenced the instant action for judicial review. (TR 5-7). The parties filed Motions for Summary Judgment and the issues for review are whether Defendant's denial of benefits was supported by substantial evidence on the record and whether this case should be remanded for consideration of additional evidence.

## III. PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

### A.     Plaintiff's Testimony

Plaintiff was forty-seven years old at the time of the administrative hearing and forty-four years old at the time of alleged onset[1]. (TR 222). Plaintiff has a high school education and past work experience as a physical laborer, boiler operator and in building maintenance. (TR 60, 215). Plaintiff testified that he enjoyed working but now "nobody wants to take a chance of sending [him] up ladders" or putting him in high places due to his condition. (TR 215). Plaintiff testified that his friend hired him to work part time in a bowling alley as an assistant manager, but eventually let him go because Plaintiff was not able to move around as much as necessary. (TR 215). Plaintiff lives with his wife and a stepdaughter. (TR 217).

Plaintiff testified that he has pain in both ankles, noticeably worse in the left ankle. (TR 214). He testified that he cannot be on his feet long enough to do his work and his ankle swells after ten or fifteen minutes. (TR 217). He testified that he has constant pain in the ankle joint which was diagnosed as tarsal tunnel syndrome and nerve damage. (TR 217). Plaintiff testified that he has trouble lifting things if he has to bend or flex his ankle, otherwise his upper body strength has not

---

[1] Plaintiff proceeded at the hearing without representation. (TR 211-12). The ALJ advised Plaintiff of his right to representation and asked Plaintiff if he wished to have additional time to get a representative. (TR 212). Plaintiff stated that he was "prepared to proceed" without a representative. (TR 212).

changed. (TR 218). Plaintiff can stand for twenty or thirty minutes before his ankle swells and can walk two to three city blocks before he has pain and swelling. (TR 218). He testified that he uses a cane on a daily basis, primarily outside and if he walks any distance, but he can get around without it. (TR 219). He does not walk much in the house but he can climb one to two flights of stairs with the use of a handrail. (TR 219). Rain and cold weather affect his condition. (TR 219).

Plaintiff testified that he takes Topamax, Lyrica and hydrocodone and the medication does "not really" help. (TR 220). He testified that he has "a little bit" of blurred vision from the Topamax. (TR 220). Plaintiff testified that the blurry visions does not affect his ability to drive, but that he does not drive a lot. (TR 220). He drives his step-daughter to school each day and picks her up, uses the Internet, sits around, does some stretching exercises and keeps his house clean. (TR 220-21). He testified that he cooks "a little bit" but his wife does most of the cooking. (TR 220). He testified that he does not go a lot of places and that each doctor has told him that the more he stays off his feet the better chance he has of the ankle healing, but Plaintiff testified, "That really hasn't worked." (TR 221).

### B. Medical Record

Plaintiff first reported to Dr. Harvey Lefkowitz at Michigan Foot and Ankle, P.C., on December 2, 2004 for complaints of left ankle pain and flat feet. (TR 138, 141-47). Dr. Lefkowitz reported limited yet present dorsiflexion in the right and left ankles, tightness in the gastroc soleal group, virtually no subtalar joint range of motion on the left and minimal subtalar joint motion on the right, and pedal pulses palpable bilaterally. (TR 141). The doctor diagnosed subtalar joint coalition on the left and right, pes valgo planus, ankle valgus bilaterally, gastroc soleus equinus bilaterally, likely navicular cuboid synostosis worse on the left and sinus tarsitis left. (TR 141). A

3

December 7, 2004 CT of the right and left lower extremities revealed bilateral juxtaarticular erosion "most significantly at the lateral aspect of the inferior articular surface of the talus," and no evidence of tarsal synostosis. (TR 152).

On December 23, 2004 Dr. Lefkowitz performed surgery on Plaintiff's left foot and ankle. (TR 104-08). Plaintiff's preoperative diagnoses were left foot deformity with painful subtalar joint and equinus deformity of the left ankle. (TR 104). The procedures included tendo achillis lengthening, subtalar joint arthrodesis and "ankle arthrotomy with insertion of 7.3 cannulated." (TR 104). During the surgery, Plaintiff's peroneus brevis tendon was lacerated. (TR 104). On December 27, 2004 Plaintiff reported that the foot was "doing good," he had some soreness the second night after surgery, and he was getting some leg cramps. (TR 131).

Plaintiff attended approximately one to two follow-up appointments per month from January through April 2005. (TR 122-33). On January 10, 2005 Plaintiff reported muscle spasms in his leg and was prescribed Naprosyn and Flexeril. (TR 130). On January 31, 2005 Dr. Lefkowitz noted some swelling in the left foot and tenderness around the incision, but reported that Plaintiff was overall "doing excellent." (TR 129). On February 15, 2005 Dr. Lefkowitz again reported some swelling and mid tarsal inflammation attributed to probable arthritic change. (TR 128). The doctor review x-rays and reported "good fusion of the subtalar joint" and that the Achilles' had healed. (TR 128). Plaintiff's cast was removed, he was advised to return to wearing a soft shoe" and he was referred for physical therapy. (TR 128).

On March 15, 2005 Dr. Lefkowitz reported that Plaintiff's subtalar joint fusion was "healing excellently"and he had no complaint regarding the same. (TR 127). Plaintiff reported stiffness and soreness in the plantar fascia and gastrosoleal insertion. (TR 127). On April 1, 2005 Plaintiff reported that he was using the cane and was in pain again following an episode where he "just got

4

up and started to walk" resulting in pain in the bottom of his heel. (TR 126). The doctor diagnosed chronic plantar fasciitis on the left and left postop Achille's lengthening and subtalar joint fusion. (TR 126). The doctor reported that Plaintiff had reverted to walking with a cane and that they would try to schedule him for a left endoscopic plantar fasciotomy (EPF) on April 14, 2005. (Docket no. 125-26). The doctor's office notes report that Plaintiff had left a message notifying the doctor that his employer wanted him to see another doctor. (TR 124). A handwritten noted on an email from Michigan Foot and Ankle dated April 11, 2005 reports that the "company Dr" said Plaintiff could perform "light duty or come in for 2 wks then can go off again even though I did not release him." (TR 124). Dr. Lefkowitz's notes from April 14, 2005 stated that Plaintiff reported that the bottom of the foot was "doing better" but there was "pain in the ankle." (TR 122). The doctor observed swelling and joint effusion of the left ankle over the mortise area. (TR 122). He injected Xylocaine and Decadron and prescribed Celebrex. (TR 122). He noted that Plaintiff was back to work. (TR 122).

On June 27, 2005 Dr. Lefkowitz reported that Plaintiff had requested to come in to the office due to foot swelling. Plaintiff reported that he had returned to work. (TR 120). The doctor gave Plaintiff Xylocaine and Decadron injections again and recommended an Unna boot for edema of the left lower extremity and venous insufficiency. (TR 120). The doctor prescribed Naprosyn b.i.d. and Mederma to be applied to the scar tissue. (TR 120). The doctor completed a form verifying that Plaintiff was unable to work until further notice and that his diagnosis was scar tissue and joint pain of the left foot. (TR 121). On July 5, 2009 the doctor noted that the medication had reduced the swelling, but that Plaintiff still had pain. (TR 120). Plaintiff continued to report pain in July 2005. (TR 118-19).

On July 20, 2005 Dr. Lefkowitz performed EPF on Plaintiff's left foot and applied a below

5

the knee cast to address Plaintiff's preoperative diagnosis of left foot plantar fasciitis. (TR 101-03, 116, 119). On July 21, 2005 Plaintiff called the doctor and reported a blood spot on the back of his cast. Plaintiff was advised not to walk on the cast and to use the boot when walking. (TR 115). On July 25, 2005 Plaintiff reported that his foot was "doing good" and felt "a lot better than before." (TR 113-14). On July 26, 2005, Doctor Lefkowitz completed a form noting that Plaintiff's treatment covered the period from July 20, 2005 until his follow-up visit on August 1, 2005 and that it was unknown when Plaintiff could return to work. (TR 112). On August 1, 2005 Plaintiff again reported that his foot was "doing pretty good" and felt "better than it did before surgery." (TR 113). The doctor reported that Plaintiff's "cast is quite broke down from overuse." (TR 111). On August 18, 2005 Dr. Lefkowitz reported that Plaintiff would return in a couple of days to a week for cast removal and was "doing fine without complaints." (TR 110). The doctor's notes on September 27 and October 11, 2005 state "N/A." On October 25, 2005 the office notes report that they tried to contact Plaintiff to reschedule, but his phone line was busy for a long time, so they sent a post card. (TR 110).

Plaintiff underwent a state agency medical examination with Babu Lal Nahata, M.D., on December 17, 2005. (TR 158-60). At that time Plaintiff was taking Naproxen 500 mg. twice per day. (TR 159). The doctor noted that Plaintiff had tenderness around the scar and the joint line on his left ankle. (TR 160). Plaintiff also had decreased range of motion, decreased inversion and eversion and negative five degrees dorsiflexion and plantarflexion in the left ankle. The right ankle range of motions were normal but associated with some pain. (TR 160). Left ankle muscle strength was 4-4+/5 and right ankle muscle strength was 5-/5. (TR 160). Dr. Nahata noted that Plaintiff uses a cane occasionally and could not walk on heels and toes or tandem walk, but his gait was stable and within normal limits. (TR 164). Dr. Nahata diagnosed Plaintiff with a history of left ankle injury,

status post left ankle fusion with ongoing pain and ankle strain, decreased range of motion in the left ankle and bilateral pes planus deformity with mild right ankle strain. (TR 160).

State agency consultant Mahmood Tariq completed a Physical Residual Functional Capacity Assessment on January 11, 2006 and concluded that Plaintiff is limited to occasionally lifting twenty pounds, frequently lifting ten pounds, standing and/or walking about six hours and sitting about six hours in an eight-hour workday and is unlimited in pushing and/or pulling except as consistent with the lifting/carrying restrictions. (TR 167). The consultant concluded that Plaintiff is limited to occasional climbing of ramps, stairs, ladders, ropes and scaffolds and occasional kneeling, crouching and crawling but may perform frequent balancing and stooping. (TR 168). He concluded that Plaintiff had no other limitations and found him to be partially credible. (TR 171).

Plaintiff reported to A. Dianne Obayan, M.D., PMR, on November 1, 2006 with left ankle pain. (TR 182-83). Dr. Obayan noted that Plaintiff had pes planus deformities bilaterally. Dorsiflexion of the left ankle was negative three degrees and plantarflexion was twenty to twenty-five degrees. (TR 183). Dr. Obayan diagnosed left ankle ankylosis and remote possibility tarsal tunnel syndrome. (TR 183). Dr. Obayan referred Plaintiff to physical therapy in November 2006. (Docket no. 179). The physical therapy evaluation Plan of Care noted that Plaintiff had "[d]ifficulty with inability to tolerate standing and walking more than about 15 minutes," but that he had no significant weakness noted in the ankles and had good rehabilitation potential. (TR 179).

On December 1, 2006 Plaintiff reported to Dr. Obayan with severe pain in his ankle and lateral aspect of his feet, which started suddenly after he stood up. (TR 184). The doctor noted "some tenderness of the soft tissue just inferior to the lateral malleolus," ankle range of motion was restricted and Plaintiff had significant pain with inversion and plantar flexion. The doctor diagnosed left foot anterior talofibular ligament sprain. (TR 184). Plaintiff was advised to continue with

7

physical therapy and the doctor scheduled Plaintiff for an electrodiagnostic study of the lower extremities. (TR 184).

Plaintiff underwent an EMG on December 18, 2006. (TR 181). The electrodiagnostic findings were normal except for absent responses of the left median and lateral plantar nerves and prolonged left tibial H - reflex. (TR 186). Dr. Obayan concluded that the findings were consistent with tarsal tunnel syndrome on the left. On January 12, 2007 Plaintiff reported left ankle pain rated at a four to five on a ten scale and pain increasing to a ten of ten with activity. (TR 188). His reports included paresthesias and numbness in the posterior lateral aspect of the ankle. (TR 188). Plaintiff reported continuing to take his medication and denied any side effects. (TR 188). Plaintiff was to resume physical therapy three times a week for four weeks. (TR 188).

The record contains reports from Haranath Policherla, M.D., SCP, neurologist, dating from February 21, 2008 to May 8, 2008[2]. March 18, 2008 x-rays revealed degenerative changes at the ankle joint and postsurgical changes for the subtalar arthrodesis performed in 2004. (TR 199). A bone scan of the same date revealed "[f]ocal increased radiotracer activity in the left ankle around the talus and calcaneus, suggestive of osteomyelitis. Hardware loosening, or fracture could have similar appearance." (TR 198). On May 8, 2008 Dr. Policherla noted that Plaintiff was last seen on February 21, 2008 and was diagnosed as having complex regional pain syndrome and he will continue taking Topamax at an increased dosage of 75 mg. p.o. b.i.d. (TR 197). The EMG from February 21, 2008 concluded that Plaintiff has "left moderate peroneal neuropathy at the knee." (TR 203).

---

[2] It appears that Dr. Policherla's June 12, 2008 report stating that Plaintiff is "[m]ost likely suffering from complex regional pain syndrome," was presented to the Appeals Council and was not before the ALJ. (TR 204).

8

### C.     Vocational Expert

The ALJ asked the Vocational Expert (VE) to consider an individual of Plaintiff's age, past relevant work-experience and high-school education, limited to lifting twenty pounds occasionally and ten pounds frequently, ability to stand for two hours and sit for six hours in an eight-hour workday, walk three blocks, and with all nonexertional physical limitations to occur only occasionally, including climbing, balancing, stooping, kneeling, crouching and crawling. (TR 223). The VE testified that such an individual could not perform Plaintiff's past relevant work. (TR 223). The VE testified that such an individual could perform jobs within the sedentary, unskilled category including assembler (4,200 jobs in the region that is the "low two-thirds of Michigan, DOT 725.684-018), inspector (1,200 in the region, DOT 521.687-086), and information clerk (10,800 in the region, DOT 237.367-010). (TR 223-24). The VE testified that the jobs are consistent with the descriptions in the Dictionary of Occupational Titles. (TR 224).

The ALJ asked the VE to consider an individual the same as the first hypothetical, but with the addition that the individual is unable to sustain an eight-hour workday. (TR 224). The VE testified that such an individual would not be able to perform any job on a full-time competitive basis. (TR 224).

### IV.    ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through December 31, 2010, had not engaged in substantial gainful activity since December 1, 2004 and suffered from a status post left ankle fusion and bilateral pes planus, severe impairments, he does not have an impairment or combination of impairments that meets or equals the Listing of Impairments. (TR 16). The ALJ found that Plaintiff's allegations regarding the extent of his symptoms were not totally credible and although Plaintiff could not perform his past work, he has

9

the ability to perform a limited range of light work and there are jobs that exist in significant numbers in the economy which Plaintiff can perform. (TR 19-20). Therefore he is not suffering from a disability under the Social Security Act from December 1, 2004 through the date of the ALJ's decision. (TR 21).

## V.     LAW AND ANALYSIS

### A.     Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial

evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.      Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff argues that new and material evidence warrants a remand pursuant to sentence six of 42 U.S.C. § 405(g), the ALJ's credibility finding regarding Plaintiff's pain and limitations is not supported by substantial evidence, and the ALJ's RFC finding is not supported by substantial

11

evidence.

**C.     Analysis**

Plaintiff argues that the Court should remand his claim for a new hearing based on evidence which Plaintiff argues confirms a nonunion of Plaintiff's previous subtalar arthrodesis, which resulted in revision surgery and bone grafting in January 2009. Plaintiff argues that the new medical evidence involves his left ankle and shows that his 2004 surgery was unsuccessful. (Docket no. 12 at 19-20 of 29). In cases where, as here, the Appeals Council declines to review the ALJ's decision, judicial review is limited to the evidence that was part of the record before the ALJ. *Cotton v. Sullivan*, 2 F.3d 692 (6th Cir. 1993); *Casey v. Secretary*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Wyatt v. Sec'y*, 974 F.2d 680, 685 (6th Cir. 1993). Furthermore, under 20 C.F.R. § 404.970(b), "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."

The "court is confined to review evidence that was available to the Secretary, and to determine whether the decision of the Secretary is supported by substantial evidence." *Wyatt*, 974 F.2d at 685 (*citing Richardson*, 402 U.S. at 401). The court may still remand the case to the ALJ to consider this additional evidence but only upon a showing that the evidence is new and material and "that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). This is referred to as a "sentence six remand" under 42 U.S.C. § 405(g). *See Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 549 (6th Cir. 2002). The party seeking remand has the burden of showing that it is warranted. *See Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). "A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d

at 357 (*citing Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984)). "In order for the claimant to satisfy his burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711 (*citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)); *see also Cotton v. Sullivan*, 2 F.3d 692, (6th Cir. 1993) ("Where a party presents new evidence on appeal, this court can remand for further consideration of the evidence only where *the party seeking remand* shows that the new evidence is material.")(emphasis added)(citations omitted).

The documents at issue are medical records of Plaintiff's examinations from November 18, 2008 to December 9, 2009 for complaints of bilateral foot and ankle pain, accompanying CT scans, and records of Plaintiff's revision subtalar arthrodesis of the left ankle on January 19, 2009 and documentation of follow-up examinations through April 2009. (Docket no. 12-2). It also appears that Dr. Policherla's June 12, 2008 report stating that Plaintiff is "[m]ost likely suffering from complex regional pain syndrome" was not before the ALJ. (TR 204). Plaintiff predominately treated with Richard Needleman, M.D., during this time and Dr. Needleman performed the 2009 revision subtalar arthrodesis. (Docket no. 12-2).

All of the documents except Dr. Policherla's post-date the ALJ's decision and none of the documents were before the ALJ. Therefore, the Court may not review this evidence except to determine whether the case should be remanded for consideration of the additional evidence. The evidence must be new and material and it must relate to the period on or before the date of the ALJ's hearing decision. Plaintiff has shown good cause for failing to incorporate this evidence in the record before the ALJ because the examinations and surgery on which the evidence is based post-date the ALJ's decision.

13

Dr. Policherla's June12, 2008 report is not new evidence. It pre-dates the ALJ's decision by more than one month. (TR 204). Furthermore, Plaintiff has not shown good cause for failing to produce this evidence to the ALJ. Finally, the evidence is duplicative of other material in the record and is not material. As Plaintiff points out, Dr. Policherla stated that Plaintiff is "[m]ost likely suffering from complex regional pain syndrome." (TR 204). The report does not, however, indicate that this diagnosis relates to the period of time prior to the ALJ's decision. Dr. Policheral also stated that Plaintiff suffers from degenerative arthritis in the right ankle," but that this is "independent of left ankle changes where he had previous surgery." The June 12, 2008 report simply does not establish that it relates to the period of time prior to the ALJ's decision or, to the extent that it addresses prior diagnoses, it does not show anything other than a subsequent deterioration or change in condition after the ALJ hearing. For these reasons, Dr. Policherla's June 12, 2008 report does not require remand under sentence six of 42 U.S.C. § 405(g).

The remaining additional evidence is new because is was not available at the time of the administrative proceeding. The Court also finds that the evidence related to the 2009 subtalar arthrodesis and Plaintiff's left ankle related to the period before the ALJ's hearing decision because it directly relates to the left foot subtalar arthrodesis performed in 2004. For example, at the November 2008 examination Dr. Needleman noted that he suspected "a nonunion of [Plaintiff's] previous arthrodesis site." (Docket no. 12-2). On December 9, 2008 Dr. Needleman concluded that Plaintiff "appears to have a nonunion of attempted subtalar arthrodesis with one transfixion screw," and recommended left foot surgery consisting of a "[r]evision subtalar arthrodesis, removal of hardware and bone grafting from locally in the region of the medial metaphyseal junction of the tibia." (Docket no. 12-2).

"Evidence of a subsequent deterioration or change in condition after the administrative

hearing is deemed immaterial." *Wyatt*, 974 F.2d at 685 (*citing Sizemore*, 865 F.2d at 712). The November 2008 CT of Plaintiff's left lower extremity revealed no significant fusion of the subtalar joint, severe posterior subtalar joint degenerative changes and small joint effusion. (Docket no. 12-2). The November 2008 CT of the right lower extremity revealed moderate osteoarthrosis of the posterior subtalar joint, small ankle effusion and mild degenerative changes of the tarsal metatarsal joints and first metatarsal/medial cuneiform joint. (Docket no. 12-2). In this instance, evidence regarding arthritis and degenerative changes is immaterial as evidence of a subsequent deterioration or change in condition after the ALJ's hearing. The evidence that there was no significant fusion of the subtalar joint, however, sheds additional light on the success of the 2004 surgery.

To show that this evidence is material, Plaintiff must show that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence. Following the January 2009 surgery, Dr. Needleman's January 27, 2009 report notes that Plaintiff was nonweightbearing, icing and elevating his foot. (Docket no. 12-2). He was also reported to be doing well after the surgery. (Docket no. 12-2). A February 17, 2009 x-ray of the left foot revealed no complication of the internal hardware and no subtalar synostosis. (Docket no. 12-2). Dr. Needleman reported that Plaintiff was "well-appearing" and "in no apparent distress," and was advised to continued to be nonweightbearing. (Docket no. 12-2). A March 17, 2009 x-ray of the left foot revealed an "[u]ncomplicated appearance of a revised left subtalar arthrodesis." (Docket no. 12-2). By April 21, 2009 an x-ray revealed a well-healed subtalar arthrodesis. (Docket no. 12-2). Dr. Needleman noted that Plaintiff was "[d]oing very well," had the cast off and was wearing an ankle walker boot, could perform weightbearing as tolerated and "get out of the boot in 2 weeks and wear (sic) sneaker" if he felt no discomfort. (Docket no. 12-2).

Despite Defendant's argument that the new evidence shows that Plaintiff was "doing very

well" following the January 2009 surgery and that he was able to bear full weight, the success of the later surgery does not diminish the relevance of the new evidence to the extent that it shows a nonunion of the prior subtalar arthrodesis and bears on Plaintiff's condition during the relevant time period. (Docket nos. 16 and 12-2, Report dated 12/09/08). The new evidence of Plaintiff's nonunion of the subtalar arthrodesis is material because it tends to show that Plaintiff's earlier subtalar arthrodesis surgery was not successful and it provides objective clinical evidence for Plaintiff's claim of pain, including his allegation that he cannot be on his feet for more than twenty to thirty minutes, a claim to which the ALJ assigned "little weight." (TR 19, 218). *See generally Bauzo v. Bowen*, 803 F.2d 917, 926 (7th Cir. 1986).

This case should be remanded for consideration of the new evidence and further proceedings consistent with this opinion pursuant to sentence six of 42 U.S.C. § 405(g). Because a sentence six remand is warranted, the Court declines to address Plaintiff's arguments in support of a remand pursuant to sentence four of 42 U.S.C. § 405(g). *See Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991) (Under a remand by sentence six of section 405(g), "[t]he district court does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination. Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding."); *see also Isaac v. Astrue*, 2008 WL 471534 at *6 (S.D. Ohio Feb. 14, 2008) (remanding under sentence six, therefore declining to address claimant's sentence four arguments).

## VI.     CONCLUSION

The Court should find that there is good cause for remand pursuant to sentence six of 42 U.S.C. § 405(g) and Plaintiff's Motion for Summary Judgment and/or Remand (docket no. 12)

should be GRANTED in part and the case should be remanded for consideration of new and material evidence presented by Plaintiff. Because this is a pre-judgment remand, the case should be administratively closed while the Commissioner is considering the new and material evidence. *See Leslie v. Astrue*, 2008 WL 4059946 at *9 (S.D. Ohio Aug. 26, 2008) (citing *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir.1994)).

**REVIEW OF REPORT AND RECOMMENDATION**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 12, 2010      s/ Mona K. Majzoub

        MONA K. MAJZOUB
        UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

      I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 12, 2010        s/ Lisa C. Bartlett
                                                Case Manager